UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

SHMUEL ABRAHAM,

Defendant.

**20-cr-411 (RA)**

## DEFENSE SENTENCING MEMORANDUM
## ON BEHALF OF SHMUEL ABRAHAM

Susan R. Necheles
Gedalia M. Stern
NechelesLaw LLP
1120 Sixth Avenue, 4th Floor
New York, NY 10036
212-997-7400
gstern@necheleslaw.com

October 16, 2024

**INTRODUCTION**

We respectfully submit this sentencing memorandum on behalf of Shmuel Abraham.

Shmuel pleaded guilty to a single-count Superseding Information, charging him conspiring with his brothers to defraud Amazon, in violation of 18 U.S.C. § 371. Shmuel has admitted that, over parts of 2017 and 2018, and when he was twenty-one and twenty-two years old, he used his Amazon vendor accounts to defraud Amazon.

Shmuel has acknowledged, both in his allocution and letter to the Court, that he has no excuse for his actions and that they were deceitful and wrong. *See* Shmuel Abraham Letter, Ex. A ("What I did was shameful, illegal and just plain wrong. There is no excuse for what I did, and I deeply regret not only the harm I caused, but also having behaved dishonestly."). Thus, in this Memorandum, we seek not to excuse Shmuel's conduct, but rather address why—given how young he was when he committed the crime, as well as related factors, such as his upbringing and the negative influence of his older bothers—a non-incarceratory sentence that allows Shmuel to continue becoming the man he can, and wants to, be is the appropriate sentence.

Ultimately, in considering Shmuel's conduct and deciding on his punishment, we respectfully request that the Court bear in mind the exhortation from the Second Circuit that, because there is "no burden more onerous than imposing sentence in criminal cases," "a sentencing judge must have some understanding of the diverse frailties of humankind," and "a generosity of spirit, that compassion

which causes one to know what it is like to be in trouble and in pain." *Singh*, 877 F.3d at 121.

The parties, in the plea agreement, agreed that the sentencing guidelines are 37-46 months. *See* PSR ¶5(C)(iv).[1] Non-withstanding these guidelines, we submit that, given Shmuel's youth at the time of his crime, a non-incarceratory sentence is sufficient, but not greater than necessary, to meet the aims of 18 U.S.C. § 3553(a).

## I.    HISTORY AND CHARACTERISTICS OF SHMUEL ABRAHAM

### A. Childhood and Education

Shmuel was born in 1996 to Moishe and Rachel Abraham. Abraham's father is a rabbi and his mother is a homemaker. Shmuel is the ninth of eleven siblings.

Shmuel had a difficult childhood, due both to the family's poverty and his extremely strict religious upbringing. The family was poor and struggled to make ends meet, with, for example, Shmuel never receiving new clothes—everything he wore being hand-me-downs from siblings or cousins. *See* PSR ¶ 67. As his brother describes, "[t]here were periods that were very difficult, both financially and emotionally, that I and my siblings are still working to heal from." Fishl Abraham Letter, Ex. M. And while their childhoods were difficult for most of the Abraham children, "Shmuel had it harder," *id.*, "especially ████████████████████

---

[1] The Parties arrived at this calculation by using "gain" to determine the §2B1.1 loss number. But even if the Court uses intended loss, as it has in the cases of the other Abraham brothers, the guidelines for Shmuel would be the same. *See* Government Letter, dated Sep. 16, regarding intended loss.

█████████████████████████ Shmuel," which meant that Shmuel "didn't get much attention because our ████████████████████████████████████ ██████" Frimy Rosenberger Letter, Ex. N.

The Abraham family was Hasidic, from the Satmar Hasidic sect. While many in the Hasidic community are cloistered and somewhat skeptical of outside influences, Shmuel's parents, particularly his mother, were extreme in this regard. She was, for example, opposed to things as simple as driving a car, owning a smart phone, or wearing designer shirts. Similarly, no English-language books or newspapers were allowed in the house—only books in Yiddish or Hebrew.

Moreover, Shmuel's mother came from a family that believed that men should not work at all but instead devote their time exclusively to religious study and prayer. For this reason, she refused to allow her children, including Shmuel, to attend any secular classes at the private religious schools he attended. At those schools, the morning is traditionally dedicated to religious studies while secular topics (*e.g.*, math, English, and science) are studied in the afternoon. Shmuel did not participate in the afternoon classes dedicated to secular studies.

Shmuel's lack of education was exacerbated by his ████████████████, ████████████████████████████████████████. In elementary school, he ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████ To this day, his reading and writing skills, particularly of English, are weak. He was also "unable to focus on his classes, take tests, or

participate in certain school activities." PSR ¶ 69. *See also* Rabbi Joseph M.

Lebovits, Ex. X (one of Shmuel's principal's noting that Shmuel "struggled as a

student."). As discussed below, Shmuel struggled through traditional school until he

was approximately sixteen and never received a high school diploma.

Shmuel, in addition to █████████████, felt constricted by his parents'

narrow world view. *See* Shmuel Abraham Letter, Ex. A ("As I got older, I became

very frustrated with the restrictions placed upon me, leading to misunderstandings

with my parents."). Shmuel was more open-minded than his parents and interested

in figuring things out for himself and not simply being told what to do. His

relationship with his mother became so strained that, in the middle of high school,

he was sent to live with his brother in Israel and attend school there. *See* Fishl

Abraham Letter, Ex. M ("In fact, when at one point Shmuel needed to go to school

in Israel so as to get a break from a being around our parents, he boarded in our

apartment, as we were living [in Israel] at the time."). Shmuel attended school there

for a year and a half and loved it. He felt free for the first time in his life and was

finally able to explore things on his own. After completing the program in Israel, he

returned to America and attended United Talmudical Seminary, a *yeshiva* in New

York City. He studied there for 2 years until he was 19. At that point, "many of [his]

friends were [getting] married, as is common in the Hasidic community," but not yet

feeling ready to get married, he "began looking for ways to earn an income." Shmuel

Abraham Letter, Ex. A. But, as discussed above, his "education in the secular world

was practically nonexistent," and his parents had given him "little exposure to the

outside world … . [He] felt alone, without any knowledge or education on how to proceed in life." *Id*. He was, however, "desperate to earn money to make [his] way," as he "didn't want to be poor like [he] was growing up." *Id*.

B. Amazon Business

With few available job opportunities or prospects, Shmuel decided that, like his three older brothers and many others in his Hasidic community, he would open an Amazon retail business, which had minimal barriers to entry. *See generally* Leticia Miranda, America's Orthodox Jews Are Selling A Ton Of The Products You Buy On Amazon, BuzzfeedNews, Sept. 4, 2019, available at https://www.buzzfeednews.com/article/leticiamiranda/amazon-orthodox-jews.

Shmuel was around 20 when he first started an Amazon business. Initially, he created a third-party account, which sold items directly to consumers on the Amazon platform. The following year, in 2017, when Shmuel was 21, and after hearing from others that he could make more money by selling merchandise directly to Amazon, he created vendor accounts, which allowed him to sell items directly to Amazon. Unfortunately, as Shmuel has acknowledged, he used these accounts to defraud Amazon, through the use of over-shipment and unit substitution. PSR ¶¶ 28–29. This conduct continued for about a year, until late 2018.

Shmuel acknowledges that what he "did was shameful, illegal and just plain wrong," and that there "is no excuse for what I did, and I deeply regret not only the harm I caused, but also having behaved dishonestly." Shmuel Abraham Letter, Ex. A. He writes that "[t]his is not the person I want to be, nor the example I want to

set for my children, friends, and family. I failed to live up to the standards of honesty I believe in, and those taught by my religion." *Id.*

### C. Shmuel's Wife and Children

In December 2018, when Shmuel was 22 and shortly after the charged conduct ended, Shmuel married his wife Roiza. They now have two children: ██████ aged 4, and ██████, who is approximately three months old.

Shmuel is a caring husband and father whose "wife and child[ren] are his priority." Fishl Abraham Letter, Ex. M. Even when dealing with the initial anxiety of his arrest, he always made his wife "his priority" and made sure to be "there for [her] in so many ways." Roiza Abraham Letter, Ex. B. ████████████████ ███████████████████████████████████████████████████████ ████████████████████████ to help them properly deal with that stress. *See also* PSR ¶72 ("Abraham reported that ████████████████████"). Through the ups and downs, they are "best friends and partners." Ex. B.

Shmuel is also a hands-on father to his two young children. Roiza movingly writes of the "very special connection" Shmuel has with his older son ██████ and of "finding Shmuel sitting next to the baby's bassinet just looking and smiling at him." *Id.; Acccord id.* ("Shmuel works so hard every single day full time to be able to provide and support us financially, he puts in so much energy and effort to make sure we are happy and always taken care of."); Usher Zussman Letter, Ex. T ("He is a very involved father, who is hands-on with his child, changing diapers or watching the baby so his wife can rest."); Frimy Rosenberger Letter, Ex. N ("Shmuel has a

close relationship with his son ███. I get emotional watching Shmuel take joy in his own family and shaping the warm home he always dreamed of."); Fishl Abraham Letter, Ex. M ("He is a warm and caring father and husband who makes sure to spend quality time with them. I know that he also works with mentors to become an ideal husband and father.").

D. Shmuel is a Caring and Giving Member of the Community

In addition to being a loving father and husband, Shmuel has already shown himself to be, although still a relatively young man, a caring and generous friend and member of the community.

For example, from the time he was a teenager, Shmuel has volunteered with Chai Lifeline, "an organization supporting sick children and their families, who are enduring cancer and other illnesses." Chaim Weiser Letter, Ex. J. *See generally* https://www.chailifeline.org/. "Shmuel invested his heart and soul in these sick children," and would "go at all hours of the day or night to be with sick little kids." Ex. J. *See also* Chai Lifeline Letter, Ex. P ("Throughout his tenure at Chai Lifeline, Mr. Abraham has shown kindness and truly exemplary character. Specifically, Mr. Abraham has given his time and efforts to help and better the lives of many children with disabilities and special needs."); Abraham Goldstein Letter, Ex. D ("Shmuel was very popular with the sick kids in the hospital and they always were so happy when he came. We would take over being with the kids so that the parents could go home or take a break and be with their other children."); Mayer Pollak

Letter, Ex. U ("Shmuel was loved by the kids and the families. Shmuel's smile is priceless, and he could cheer up even the sickest kids.").

He would entertain the "children for hours, played countless games and held their hands throughout the grueling rounds of chemo and radiation." Chaim Weiser Letter, Ex. J. And Shmuel was always willing to go the extra mile for these children. Once, after a Chai Lifeline-arranged snow tubing trip in Pennsylvania, "one kid went to his counselor and said that he was feeling dizzy and was afraid to go home with the bus." Mayer Pollak Letter, Ex. U. The counselor asked if anyone would be willing to drive the child home and "Shmuel agreed and they called to get permission from the parents." Only then did "Shmuel even as[k] me where the child lived. When I told him Lakewood, New Jersey, he put the location into the GPS and saw that it would cost him an extra hour and forty-five-minute drive. Instead of backing out, Shmuel was happy to do it." *Id.* Similarly, Shmuel once "hosted a party in his own home, celebrating the culmination of a year-round study project that the sick children undertook. He provided food, music and fun and the children had the time of their lives." Chaim Weiser Letter, Ex. J.

Many letter writers also tell Your Honor how Shmuel helped them when they were dealing with either a tragedy or medical emergency. Hersh Moskowitz writes of the time he was in Florida on a vacation when ████████████████████ ██████████████████████████████████████" Ex. O. ████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████" Mr. Moskowitz, "[c]ompletely

overwhelmed, …. called Shmuel Abraham, who immediately jumped into action."
*Id.* Shmuel flew down to Florida, and then "took care of [their] every need" and
"ensured [they] had food and helped liaise with the medical teams." Then, when
Mrs. Moskowitz "was discharged from the hospital, Shmuel found [them] an
apartment near the hospital so [they] could easily visit [their] son who was still
there." When, after six months, they "were given the green light to transfer the baby
home to New York," and they "had to set up a mini-hospital in [their] home,
complete with nurses and oxygen," Shmuel helped them to arrange it "by reaching
out to local medical support organizations he knew through his volunteer work." In
short, Hersh writes that Shmuel's "unwavering support and guidance helped me
navigate the darkest days of my life." *Id. See also* Abraham Goldstein Letter, Ex. D
("[M]y father, who had a serious heart condition, had to move apartments because it
was too difficult for him to walk up steps anymore. Shmuel pitched in to help him
move and asked his other friends to help us out as well. Together they moved and
shlepped all my father's things from one apartment to the other so we could avoid
hiring a professional moving company.").

When Shmuel's sister-in-law "Raizy Jungreis, passed away at a young age
leaving behind her husband and children … Shmuel was the one who took care of
the logistics of arranging for all the siblings to come and be with the children during
the week of *Shiva* (the Jewish week of mourning)." Usher Zussman Letter, Ex. T. In
addition, he helped "raise funds for the children to have therapy and proper
support, which was a big success." And even "though he has been dealing with his

own problems," Shmuel "goes out of his way to spend time with [the children] and call them to show he cares." *Id.*

Relatedly, Chaim Weiser writes how Shmuel helped bring the community together after "one of our former school friends, Moshe Deutsch, was gunned down in a hate crime shooting in Jersey City several years ago." Ex. J. "After the *Shivah*, the traditional Jewish week of mourning, Shmuel spearheaded a campaign to raise funds to purchase and dedicate a *Torah* (Bible) scroll to a synagogue in memory of Moshe." The subsequent traditional "dedication ceremony of the completed scroll … was very moving and meaningful for the family." As Mr. Weiser writes: "This incident of senseless violence could have easily led to depression and anger, and instead, thanks in part to Shmuel, we all worked together towards a positive goal." *Id.*

Finally, Shmuel is always looking for ways to help his friends get their new businesses established. *See* Chaim Weiser Letter, Ex. J ("In typical Shmuel fashion, he tries to help friends' businesses by referring customers.  When I went into the mortgage industry in 2019, one of the first consumers who trusted me and cared enough to help me succeed in my new venture was Shmuel."); Joel Neuman Letter, Ex. AE ("Shmuel has helped many of his friends and associates with their businesses and in doing so he has loyally referred them to me for their marketing needs. His patronage helped me develop a customer base and grow my business.").

As Yoel Friedman succinctly puts it, Shmuel's "good-heartedness, pleasant nature, and caring demeanor made him beloved by all who knew him." Ex. Z.

We have summarized Shmuel's good deeds not only because they are an important mitigating factor, *see United States v. Adelson*, 441 F. Supp.2d 506, 513-514 (S.D.N.Y. 2006) ("But, surely, if ever a man is to receive credit for the good he has done … it should be at the moment of his sentencing, when his very future hangs in the balance."), but because they indicate how much Shmuel, still a young man, can contribute to society with proper rehabilitation. *See, infra*, Sec. II.B.

## II.    THE §3553(a) FACTORS COUNSEL FOR A NON-INCARCERATORY SENTENCE IN THIS CASE

In imposing a sentence, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) to arrive at a sentence that is "sufficient, but not greater than necessary" to achieve the goals of the federal sentencing regime. *See United States v. Jenkins,* 854 F.3d 181, 190 (2d Cir. 2017) (holding that "every Guidelines sentence is limited by § 3553(a)'s 'parsimony clause,' which instructs a district court to impose a sentence 'sufficient, but not greater than necessary' to achieve § 3553(a)(2)'s goals"). In fact, "a sentencing court may no longer rely exclusively on the Guidelines range; rather, the court must make an individualized assessment based on the facts presented and the other statutory factors." *Beckles v. United States*, 137 S. Ct. 886, 894 (2017) (internal quotation marks omitted); *Accord United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (holding that a "district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors.").

As discussed below, we respectfully submit that in light of the § 3553(a) factors, in particular Shmuel's youth at the time of his offense, his lack of education, and the negative influence of his older brothers, that a probationary sentence, along with a term of home confinement, would best satisfy the objectives of sentencing.

A. Shmuel's Youth at the Time of the Offense is a Significant Mitigating Factor

At the time of Shmuel's crime, he was between 21 and 22 years old and influenced by the conduct of others. As discussed below, we submit that this is an important mitigating factor that the Court should consider in fashioning Shmuel's sentence.

*1. Scientific Research, Courts, and the U.S. Sentencing Commission Have All Recognized that Youthful Offenders are Not as Culpable for their Conduct as Fully Mature Offenders*

Scientific and sociological research has long indicated that adolescents, which in this context includes individuals in their early 20s,[2] do not yet have fully

---

[2] In evaluating the consideration of youthfulness as mitigating evidence in sentencing for adults, the Washington State Supreme Court cited the MIT Young Adult Development Project, quoting, "'The brain isn't fully mature at … 18, when we are allowed to vote, or at 21, when we are allowed to drink, but closer to 25, when we are allowed to rent a car.'" *State v. O'Dell*, 183 Wn.2d 680, 692 n.5 (Wash. 2015). In *Roper v. Simmons*, 543 U.S. 551 (2005), the United States Supreme Court repeatedly cited developmental psychologist Jeffrey Arnett's (1992) article "Reckless Behavior in Adolescence," which defined "adolescence" as "extending from puberty to the early 20s." Jeffrey Arnett, Reckless Behavior in Adolescence, DEVELOPMENTAL REVIEW, 12 (1992, pp. 350, 354). *See also* Praveen Kambam and Christopher Thompson, The Development of Decision-Making Capabilities in Children and Adolescents: Psychological and Neurological Perspectives and Their Implications for Juvenile Defendants, BEHAVIOR, SCIENCE, LAW, 27 (2009, pp. 173-190) (reviewing several studies that define "youth" between ages 18-22 and document the continuation of neuroanatomical maturity into one's 20s), *available* at https://tinyurl.com/y8dczwtv. Thus, while much of the case law discussion surrounding diminished culpability pertains to juveniles under age 18, the contemporary conversations in developmental psychology show that the scope of adolescence, and therefore diminished culpability, extends beyond 18 into one's early 20s.

13

developed brains: "It is increasingly clear that adolescent brains are not yet fully mature in regions and systems related to higher-order executive functions such as impulse control, planning ahead, and risk avoidance." *Miller v. Alabama*, 567 U.S. 460, 472 n. 5 (2012). Psychological and neurological studies have shown that parts of the brain involved in behavior control continue to develop well into the 20s. *State v. O'Dell*, 183 Wn.2d 680, 692 (Wash. 2015). "These studies reveal fundamental differences between adolescent and mature brains in the areas of risk and consequence assessment, impulse control, tendency toward antisocial behaviors, and susceptibility to peer pressure." *O'Dell*, 183 Wn.2d at 692.

Thus, although juveniles achieve the ability to use adult reasoning by mid-adolescence, they still "lack the ability to properly assess risks and engage in adult-style self-control." *State v. Null*, 836 N.W.2d 41, 55 (Iowa 2013) (noting that "the human brain continues to mature into the early twenties," such that diminished decision-making capacity extends beyond age 18). Not surprisingly then, courts have recognized that a young person's decreased capacity for decision-making and risk-assessment translates to diminished culpability which is properly taken into account in sentencing. *See, e,g., United States v. McCoy,* 981 F.3d 271, 286 (4th Cir. 2020) ("In particular, in determining that [compassionate] release was appropriate for all of the defendants, the courts focused on the defendants' relative youth—from 19 to 24 years old—at the time of their offenses, a factor that many courts have found relevant[.]"); *United States v. Cheng*, 678 F.Supp.3d 312 (E.D.N.Y 2023) (granting a sentence reduction to a defendant who "committed all of his crimes in a

several-month span during which he turned 22" because, *inter alia*, "youth has been accorded overdue recognition as a potent mitigating factor in culpability."). The Supreme Court itself, in *Roper*, after evaluating the scientific and sociological research, described the differences between adults and juveniles (albeit in the death penalty context):

> [A] lack of maturity and an underdeveloped sense of responsibility … often result[ing] in impetuous and ill-considered actions and decisions[;] … [greater] vulnerab[ility] or susceptib[ility] to negative influences and outside pressures, including peer pressure … explained in part by the prevailing circumstance that juveniles have less control or less experience with control, over their own environment[;] … [and the fact that] the character of a juvenile is not as well formed as that of an adult.

*Roper*, 543 U.S. at 569-70. *See also Graham v. Florida*, 560 U.S. 48, 68 (2010) (noting that "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds. For example, parts of the brain involved in behavior control continue to mature through late adolescence.").

In line with this science, the Sentencing Commission has recently promulgated amendments to U.S.S.G. §5H1.1, the Guideline's policy statement regarding the relevancy of age towards sentencing. These amendments will go into effect on November 1, or just two days after Shmuel is sentenced. The amendment abrogates the current policy that an offender's youth is generally not relevant at sentencing, and instead adopts the following new policy:

> Age may be relevant in determining whether a departure is warranted. … A downward departure also may be warranted due to the defendant's youthfulness at the time of the offense or prior offenses. Certain risk factors may affect a youthful individual's development

into the mid-20's and contribute to involvement in criminal justice systems, including environment, adverse childhood experiences, substance use, lack of educational opportunities, and familial relationships. In addition, youthful individuals generally are more impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into young adulthood. Youthful individuals also are more amenable to rehabilitation.

§5H1.1 (effective Nov. 1, 2024).

We respectfully submit, as discussed below, that Shmuel would qualify for this youth-based departure after November 1, and therefore that the Court should vary downwards now for that same reason.

It is of course true that the new Guidelines will not yet be in effect at the time of Shmuel's sentencing. But while a sentencing court is not obligated to apply pending amendments, it can exercise its §3553(a) discretion to do so. *See, e.g., United States v. Myers*, 854 F.3d 341, 358 (6th Cir. 2017) (noting that "our precedents allow consideration of a pending Guidelines amendment" (internal quotation marks omitted)); *United States v Hayden*, 775 F3d 847, 850 (7th Cir. 2014) ("Although a sentencing judge may grant a variance from the guidelines range as a way of recognizing the likely effect of a pending amendment to the guidelines, the judge is not required to do so.").

After all, post-*Booker*, the reason the sentencing guidelines still have a "key role," is because the Sentencing "Commission fills an important institutional role: It has the capacity courts lack to base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise." *Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (internal quotation marks omitted). Thus, where the Sentencing Commission has, after review and public

comment, decided that an amendment to the guidelines is called for to best comply with its duty to promulgate guidelines that determine what sentence is appropriate in various cases, *see* 28 U.S.C. § 944(a), that decision is itself worthy of at least as much respect as its prior, soon-to-be-no-longer-operative, determination.[3] *See Rita v. United States*, 551 U.S. 338, 350 (2007) ("The Commission's work is ongoing. The statutes and the Guidelines themselves foresee continuous evolution helped by the sentencing courts and courts of appeals in that process.").[4]  We submit that this is particularly true when the new guideline comes into effect a mere two days after the defendant's sentencing date.

### 2. Shmuel's Conduct Can be Partially Explained. Albeit Not Excused, by his Age at the Time of the Offense

Shmuel was only 21 and 22 years old when he offended, and we submit that a downward variance recognizing Shmuel's reduced culpability is therefore appropriate.

This reduced culpability is not merely a question of Shmuel's age but because of the applicability of many of the youth-related "risk factors" the new §5H1.1 tells

---

[3] In fact, the Commission in this case expressly noted that the amendment "reflect[s] the evolving science and data surrounding youthful individuals, including recognition of the age-crime curve and that cognitive changes lasting into the mid-20s affect individual behavior and culpability," and is "[i]n line with the Commission's statutory duty to establish sentencing policies that reflect 'advancement in knowledge of human behavior as it relates to the criminal justice process,' 28 U.S.C. § 991(b)(1)(C)." Reason for Amendment to §5H1.1, *available* at https://www.ussc.gov/sites/default/files/pdf/amendment-process/official-text-amendments/202405_Amendments.pdf.

[4] Even if the Court was to decline to apply the soon-to-be-in-effect §5H1.1, the Second Circuit has held that an offender's immaturity at the time of the offense is an appropriate factor to be considered under § 3553(a). *United States v. Reingold*, 731 F.3d 204, 221 (2d Cir. 2013) ("the district court may, of course, take the defendant's immaturity into account in deciding where within the prescribed statutory range to sentence [defendant].").

sentencing courts to consider: "adverse childhood experiences, … lack of educational opportunities, and familial relationships." *See generally Miller v. Alab*ama, 567 U.S. 460, 476 (2012) (noting that "youth is more than a chronological fact. It is a time of immaturity, irresponsibility, impetuousness, recklessness.") (cleaned up).

As discussed above, Shmuel was someone who grew up with very limited education, due to both learning disabilities and his parents' deeply conservative worldview. This left him, around age 20, with few skills and limited job opportunities or prospects. It also left him particularly susceptible to the negative influences around him, here sadly that of his older brothers (and others he was aware of) who were making large amounts of money by over-shipping items to (and otherwise defrauding) Amazon. Three of Shmuel's older brothers, who he looked up to, were committing this crime: Heshl (eight years older than Shmuel); Zishe (six years older); and Yoel (4 years older). In particular, as the Government has explained, Yoel was the "leader" of the scheme and the brainchild behind many of its techniques. *See* Government Sentencing Memorandum as to Yoel Abraham, at 11–13. While Shmuel understands that his decision to follow the lead of his older brothers does not excuse his conduct, *see* Shmuel Abraham Letter, Ex. A. ("I am writing about my youth not to excuse my actions, which were bad and inexcusable"), we submit that his decision to act like his older brothers is sadly understandable. *See* §5H1.1 (effective Nov. 1, 2024) ("In addition, youthful individuals generally are … susceptible to outside influence as their brains continue to develop into young adulthood.").

The positive flip side of the immaturity and irresponsibility of youthful offenders is their greater capacity for rehabilitation. *See id*. ("Youthful individuals also are more amenable to rehabilitation."). Indeed, "[t]he relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside." *Roper*, 543 U.S. at 570. Shmuel is an excellent example of the rehabilitative potential of youthful offenders. As discussed further below, since he stopped committing this crime at the age of 22, Shmuel has significantly matured and taken numerous steps to ensure he never offends again.

B.  Shmuel's Significant Rehabilitation

Shmuel has fully accepted responsibility for his fraud and is committed to never offending again. As he writes to Your Honor, "I am humiliated by my actions" because this "is not the person I want to be, nor the example I want to set for my children, friends, and family. I failed to live up to the standards of honesty I believe in, and those taught by my religion." Ex. A.

Many others also write to Your Honor about Shmuel's deep regret and acceptance of responsibility. For example, his wife writes that "I'm trying to help Shmuel work through his shame and guilt for having been involved in dishonest and illegal business dealings. … He is ashamed of having let himself down, … and now as a father of two young boys, these feelings are always with him and motivate him to make sure that everything he does is completely legal and honest." Ex. B. Shmuel's brother writes that Shmuel "has told me many times how much he regrets

his serious errors." Fishl Abraham Letter, Ex. M. Similarly, Rabbi Lebovits tells Your Honor that Shmuel "is very ashamed that he got involved in, and did something that was illegal. Based on my many conversations with him, I am certain that Shmuel will never do anything illegal again." Ex. X. *See also* Frimy Rosenberger Letter, Ex. N ("I have children who are close in age to Shmuel, and I appreciate that Shmuel has had the courage to be honest with them about the cost of doing things that are illegal."); David Lebovits Letter, Ex. K ("I know how terribly he feels for having committed a crime. Over the last few years, I have seen Shmuel turn his life around, and become totally committed to never doing anything illegal again."); Ezra Lebowitz Letter, Ex. L (noting that Shmuel "has several times expressed his determined intention to learn from his mistakes and has always seemed exceedingly humble and contrite.").

Notably, this is not mere lip service; rather, Shmuel has taken concrete actions to turn his life around. *See* Abraham Goldstein Letter, Ex. D ("He didn't just talk about what happened, and how it was wrong, but he went out and he started to do things differently. ... Shmuel is more serious now, and he is very careful to make sure he is doing everything right."); Hersh & Chava L Moskowitz Letter, Ex. O ("I have known Shmuel for nine years and I would like to attest that I have witnessed significant changes in him over the past few years. He has matured and is committed to making amends and seeking redemption for his crime.").

First, he got a stable job, as an employee of a new roofing and siding company. *See* Rabbi Joseph M. Lebovits Letter, Ex. X ("I am also very proud of how

Shmuel got a new and practical job to make sure he could earn a living in a clean honest way."); Frimy Rosenberg Letter, Ex. N ("This was a turning point for him. Shmuel got a regular job and tried to do his best every day to create a stable life. He became much more serious about life in general[.]"). The owner of that company writes that, after speaking with Shmuel and recognizing "that he was prepared to work hard," hired him, and Shmuel then helped him build the "company, Craft Exteriors LLC … from the ground up." Moshe Rottenberg Letter, Ex. V. Together, they "put in very long days at construction sites … , our only priority [being] making sure the job was done properly." *Id.* Importantly, Shmuel "understand[s] now that there are no shortcuts in life," Shmuel Abraham Letter, Ex. A, and "takes pride in a job well done" and "doesn't cut corners and takes care to leave job sites neat and tidy." Shulem Shick Letter, Ex. AD. *See also* Akiva Herzog Letter, Ex. E ("On a business level, being in the construction industry, I know that Shmuel has worked hard to develop a good name. He works hard, and is honest, professional and prompt, and provides great service.").

Second, Shmuel recognized that he needed to break with some of the negative influences that had helped lead him to his criminal conduct and instead needed better mentors and advisors. As his brother Fishl writes:

> The first thing that comes to mind about Shmuel is the way he reacted to this case. Shmuel was very young at the time he was arrested, a new father, and he had been coasting along in life. After being indicted he was a broken person. He recognized that he had made very serious errors and that he needed to make big changes in his life. He found people to guide him and help him learn how to take personal responsibility for every aspect of his life. I think the most important

thing he learned was that there are no shortcuts or tricks, and that
real success takes hard work.
Ex. M.

One of Shmuel's new mentors, Benjamin Weiser, an older businessman, tells
the Court how "Shmuel reached out to me particularly when his legal case began,
seeking guidance on how to correct his course and embark on a path towards a more
positive life trajectory." Benjamin Weiser Letter, Ex. F. After describing the
numerous steps Shmuel has taken on "his journey towards self-improvement," Mr.
Weiser "personally attest[s] to the remarkable transformation I have witnessed in
Shmuel over these past few years. He has evolved into a new, improved, and
morally upright version of himself–the best iteration yet." *Id. See also* Rabbi Joseph
Lebovits Letter, Ex. X ("I have had many serious emotional conversations with
Shmuel in the past few years, about what happened and how to take his life in a
new direction, and make sure that he never repeats his terrible actions."). And, as
mentioned previously, Shmuel ████████████████████████████
████████████████████████████ Ex. B.

Third, and relatedly, Shmuel, recognizing that his youthful unhealthy
relationship towards money was a partial cause for his crime, also retained Chaim
Tauber, a personal financial coach, to help him properly budget and save for the
future. The Abrahams have worked with Mr. Tauber for over two years and they
"have consistently budgeted every month" and "have always shown restraint in
cutting expenses to match their income." Ex. H. They have stopped using credit
cards and "committed to a responsible lifestyle and live by it with unwavering
dedication and strength." *Id. See also* Roiza Abraham Letter, Ex. B ("It has been life

changing working with a monthly budget and knowing [] we can support our family on a modest budget. We have learned to save for things we need, and the difference between wants and needs."); Mayer Pollak Letter, Ex. U ("As a good friend I know how much Shmuel has worked on himself to correct the bad errors he made. He spends a lot of time getting help on his finances and asking questions to make sure everything he does is according to the law.").

For all these reasons, we submit that the Court can best accomplish the goals of the federal sentencing regime by imposing a probationary sentence on Shmuel, which, unlike a prison sentence, will not risk inhibiting all the progress Shmuel has made with his life over the last few years. *See* §5H1.1 (2024 Amendments) ("Age-appropriate interventions and other protective factors may promote desistance from crime. Accordingly, in an appropriate case, the court may consider whether a form of punishment other than imprisonment might be sufficient to meet the purposes of sentencing.").

### III.    A PRISON SENTENCE IS UNNECESSARY UNDER §3553(a)

As discussed above, we believe a probationary sentence would be the just result in this case. In this section, however, we discuss why two specific §3553(a) factors, the "need to avoid unwarranted sentence disparities among defendants" §3553(a)(6), and the need for general deterrence, §3553(a)(2)(B), do not require a prison sentence in this case.

As to the former, we recognize that Shmuel's three brothers and co-conspirators have all received incarceratory sentences. But while the "conduct" of all four brother may have been facially similar, we submit that, given the age disparity between them, Shmuel has reduced culpability such that he is not similarly situated to his brothers. *Cf. Roper*, 543 U.S. at 570 ("Juveniles' susceptibility to immature and irresponsible behavior means their irresponsible conduct is not as morally reprehensible as that of an adult. (internal quotation marks omitted)); *see also* §5H1.1 (effective Nov. 1, 2024). Thus, Shmuel does not deserve a sentence similar to those received by his older brothers. After all, "just as a court should ensure that it does not create sentencing disparities among similarly situated individuals, it should also ensure that its sentences appropriately reflect the relative culpability of individuals who are not similarly situated." *United States v. Negroni*, 638 F.3d 434, 447 n. 12 (3rd Cir. 2011).

Similarly, the need for general deterrence does not require a prison sentence in this case. In determining that prison was necessary at the sentencings of Shmuel's three brothers, the Court stressed the need for general deterrence and wondered what message the Court would send if it imposed non-incarceratory sentences. But a non-prison sentence for Shmuel, we submit, would not be interpreted by the general public as a statement by the court than white collar crime is not a big deal—the Court's imposition of prison sentences on Yoel, Heshl, and Zishe make pellucidly clear that that is not the case—but instead that youthful offenders, at least where, like Shmuel, they have shown an ability to turn their lives

around, are treated more leniently than more mature offenders. As then-Judge Kavanaugh noted, imposing a "light sentence" on an individual defendant based on the totality of the §3553(a) factors in his specific case, does not necessarily undercut general deterrence "even when it is considered in isolation." *United States v. Gardellini*, 545 F.3d 1089, 1095 (D.C. Cir. 2008). That is because while that defendant in question "may have been treated leniently, the next similarly situated [] offender cannot expect the same treatment" and "[a]nother defendant in this same situation might well receive an above-Guidelines sentence." *Id.* ("In light of the discretion afforded to district courts … only a fool would think that he or she necessarily would receive the same sentence as Gardellini for a similar tax offense."). This is particularly true both where co-defendants have already received prison sentences, thus establishing general deterrence, and where the basis for the leniency to Shmuel, his youth, would be both readily apparent to the public and a factor not applicable to most criminal defendants.

    Finally, we stress that a probationary sentence, especially one with a special condition of home confinement, is a real punishment that would be sufficient to accomplish the goals of the federal sentencing regime in this case. And while "custodial sentences are qualitatively more severe than probationary sentences, … [o]ffenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty." *Gall v. United States*, 552 U.S. 38, 48–49. Crucially, probation is "not granted out of a spirit of leniency," *id.* at 48 n.4 (quoting Advisory Council of Judges of National Council on Crime and Delinquency, Guides

for Sentencing 13–14 (1957)), as "[i]nherent in the very nature of probation is that

probationers do not enjoy the absolute liberty to which every citizen is entitled.'"

*United States v. Knights*, 534 U.S. 112, 119 (2001) (quotation marks omitted);

*accord United States v. Leitch*, No. 11-CR-00039 JG, 2013 WL 753445, at *12

(E.D.N.Y. Feb. 28, 2013) ("[I]t bears emphasis that when a judge chooses between a

prison term and probation, she is not choosing between punishment and no

punishment. Probation is less severe than a prison term, but both are

punishment."). This is particularly true when the term of probation contains a

condition of home confinement. *See generally* U.S.S.G Staff Discussion Paper,

Sentencing Options under the Guidelines, p. 20, *available at*

https://www.ussc.gov/sites/default/files/pdf/research-and-publications/working-

group-reports/simplification/SENTOPT.pdf ("The evidence to date indicates that

home confinement may be a viable intermediate sanction[.]").

*        *        *

"The sentencing of defendants in federal court is such a common occurrence

that it is important to occasionally pause and remember what is at stake. A human

life, designed both by nature and our nation's Constitution to live free and pursue

happiness, is taken away from family and familiar surroundings to serve days,

months, years, or a lifetime in a prison cell." *United States v. Faison*, No. GJH-19-

27, 2020 WL 816699, at *1 (D. Md. Feb. 18, 2020). That "sensitive, and difficult,

task," *Adelson*, 441 F. Supp.2d at 515 (S.D.N.Y. 2006), is, unfortunately, Your

Honor's responsibility. But because, for the defendant, "every day, month and year

that [i]s added to the ultimate sentence will matter," and even a short prison sentence may result, for example, in the loss of the defendant's job, it is "crucial that judges give careful consideration to every minute that is added to a defendant's sentence." *Faison,* 2020 WL 816699, at *1.

Here, for all the reasons discussed above, we submit this is not a case where it is necessary to sentence the defendant to prison and instead respectfully ask the Court to impose a probationary sentence.

## CONCLUSION

We respectfully ask that the Court sentence Shmuel to a probationary sentence, along with a term of home confinement, which we submit is sufficient but not greater than necessary to accomplish the goals of the federal sentencing regime.

Respectfully submitted,

By:    /s/ Gedalia M. Stern
NECHELESLAW LLP
Susan R. Necheles
Gedalia M. Stern
1120 6th Ave., 4th Floor
New York, NY 10036
(212) 997-7400
*Attorneys for Defendant*
*Shmuel Abraham*